May it please the Court, I'm John Barr, representing the appellant in this case. I will do my best to keep my voice up. I'd appreciate it if you'd say I've been sick as a dog for two weeks and I have trouble talking. All right, we'll try to indulge you, thank you. The issue here is whether or not the National Park Service has the discretion to fail to warn the public of a hazard it knows about, which was created or exacerbated by its activities, which is not obvious, and which affects a highly populated part of Yosemite National Park, that is to say, the area in and around Curry Village. The National Park Service has known that this is a hazardous rockfall area, and you have to look at that in geologic proportions. You go into Curry Village, you can find a bunch of rocks that obviously fell down there years ago covered with moss. They've known it's a hazardous rockfall area since 1980, even though there hasn't been, maybe prior to 1996, I'm sorry, a major rockfall into that area during recorded history. National Park Service 50, section 5, requires at least an annual review and inspection, specifically for these hazards. That is headed a part of the health and safety part for the National Park Service employees, but it doesn't apply just to them for several reasons. First, section 22, which talks about visitor safety, says that section 5 describes what's supposed to happen to take care of visitor safety. And second, this court in Blackburn found that the visitor safety program is defined in chapter 5, NPS 50. And in fact, the mandate of NPS 50 is so strong that there's a warning in it, in May. Section, it's first is mandatory, it says every- Would you make reference to where you're looking in the excerpts? I'm looking at the excerpts of record number, page 168. All right. And it says that it's mandatory that these facilities shall be inspected annually, formally inspected annually. And more often, any place there's overnight accommodations, group gatherings, tour areas, shall be inspected frequently. The term inspection- Could I just stop there? I mean, this is the, of course, difficulty anybody has in these tort claims cases is trying to figure out what is the mandatory directive if there is one. As I read this, it's talking about establishments, correct? If I'm reading the right page, I'm looking at inspections and abatement process. Yeah, under A, formal inspections. Well, it says what the program objectives are. You're supposed to, it relates to establishments, correct? All NPS establishments, meaning everything that they operate, I think. Well, but that's the question, is that it seems to me we're talking about a rock slide, correct? We're talking about what's called a rock fall, where a piece of apparently- A piece of rock staves off and breaks, which happens, correct. And is it your position that a rock face is an establishment that must be inspected? No, it's not. But my position is, well, okay, let me go back. Actually, it is, if that rock face, in this case, is overlooking a heavily used part of the park, which this is. I mean, the November 1998 rock fall almost scared the geologist to death who was sleeping. Okay, so let me just give you another example. I guess we could take judicial notice that there's a lot of evergreen trees in Yosemite, correct? Certainly. Okay, and so, and there's a lot of evergreen trees that surround, in many parks, the visitor booths and or the accommodations. So, I guess that if we were to take your interpretation that every tree needs to be inspected yearly, would that be true? No, that's not right. What happens if, what happens when lightning comes and a tree falls down on a camper or a park employee? If there is no warning and no way to anticipate that's going to happen, it's one of those things. But that's not the case here. Okay, so that, but that's different. That's a, that's a warning issue. So, what I'm trying to get at and what, what I think are charges in these cases is to try to unpack all the park policies. And see what, if any, policies are mandatory that weren't followed. So, I don't understand, if I take your definition of establishment, I don't know why the trees aren't establishments. And I think in a, in, for example, to use your analogy, Your Honor, in a, an occupied area of the, of the, as opposed to what they call back country, but in occupied, highly used areas of the park, you can spot a diseased tree. You can watch it die. It takes several years for that to happen. And I, yes, I do believe that the National Park Service, in areas like Curry Village and those sorts of places where people are invited in, in droves, they have huge parking lots there, have an obligation to look the trees over. You know, we got one that's about to turn into Widowmaker up here. And do something about it if they do, as opposed to back country. Because they're all establishment? Because the whole, that whole area is an establishment. The valley, basically, is an establishment. Certainly, certainly the floor of Yosemite Valley, I think, is, is certainly in and around Curry Village. I understand your. So, it doesn't really relate to warning. It relates to definition, then, on the way you're explaining it. It's not a question of what you knew. It's more a question of, as Judge Fernandez says, it's the whole valley is an establishment, which would include its rock formations, its trees, its cricks, its everything. And, and, and what you do depends upon, I think, very much how much it's used, what the population is. You got some place nobody ever goes, that's one thing. If you got a place like Curry Village, that's another, of course, an entirely different color. And if you look at what. So, if you know people are waiting in the streams, you have an obligation to make an inspection of the mossy rocks? No, I don't think so. I think it's the, what you're needed to make an inspection of is not mossy rocks. But, if you've got people waiting up a gorge, and you've got lots of people waiting up a gorge, and you start getting rockfall off of the, of the canyon on the side of that gorge, I think you probably ought to let people know. You're back to rockfalls, where we're talking about the whole thing being an establishment. Sure. So, you've got moss on rocks, and you've got mold on rocks. Well, I think it. They know that there's moss on rocks, and how dangerous it is to step on, as anybody who ever walks out knows. And they should put signs, I suppose? I don't think so. Be careful, mossy rocks? No, because I don't think that, again, I think that comes back to the court's decision. Well, what if the rocks are, what if they're tippy rocks? Now, again, anybody who wants to, who really knows what he's doing, before he steps on a rock in a stream or on a trail, puts his foot in sort of, let's see, is that tippy or not? Suppose it's a tippy rock. Well, you know. And somebody doesn't, just doesn't know. They're out there wandering along in their tennies along a trail, and they put their foot on a tippy rock, and it tips over. I. How about tippy rocks? I think that the answer to that is in this Court's decision in Valdez, where what the Court said is that the Park Service does have the discretion to determine which hazards are obvious and which ones aren't. And it doesn't have an obligation to warn against hazards that are obvious. Well, if there was a tippy rock in the supermarket, they'd be in big trouble. So there's a tippy rock on the trail, and that's obvious. And maybe it's not obvious. If you don't know what you're doing, it's not obvious. Well, trails are made out of rocks, and presumably whoever got to the tippy rock managed to walk there somehow and learn something in the process. We all walk all our lives. Let me go back to the page 168, and this is the Park Service document 50. Reading that document in context, it appears to talk about workplace environment, actual facilities, housing, that sort of thing. If we were to disagree with your interpretation that a rock face is an establishment, is there any other mandatory obligation of the Park Service or nondiscretionary obligation that you would point to that would pertain to the ability to find liability here? Certainly. And that is their obligation to warn the people on the ground who are in the establishment, that is to say Curry Village. You've got to remember these rocks land and blow all the pieces, and some of them have gone into Curry Village and done damage in Curry Village. Well, then that then goes. If they went out and they did do an – after this earlier rock fall, they did do an inspection, they made an assessment, and then determined that things were safe at that point, correct? The problem is after the May rock fall and the way it closed for Curry Village temporarily, they didn't involve their safety officer, which is what they're required to do before they reopen. They've got a safety officer. They're supposed to involve their safety officer. They didn't involve him. They've got a geologist. They didn't involve him. The decision to reopen was made by a guy who's the park photographer who started out as a trail maintenance guy and except for one course doesn't have any training in geology. And as far as we've been able to tell, doesn't have any training in safety. It was not – the people who are supposed to make this decision are not the people who made it. It was made by a ranger whose training is unknown, and this Mr. Snyder, who's a very nice fellow, but he's not a geologist and he's not a safety person. So I guess assuming you got over this mandatory issue, what would be the negligence, that they should have closed it down or that they should have had warning signs? At least put up a warning. You know, there's a campground there called the Rock Climbers Campground, and they maintain a bulletin board, the National Park Service does, in that campground for the purpose of providing information. They didn't even put a piece of paper up on the bulletin board. Maybe I don't quite understand it, but then don't you have an approximate cause problem because weren't there some warnings down in the camp which they didn't see? No, I don't think so, Your Honor. I don't think there were any warnings by anyone anywhere. Before they reopened it? No, there were warnings that were up for three hours on the Camp Curry, part of Camp Curry that was closed itself, that were taken down when Camp Curry was reopened three hours later. My people didn't get there for days after that. This happened in the end of March. Peter Turbush and his companions didn't arrive there until the middle of June. And both the companions have testified, submitted affidavits. They should have just kept the signs up. I'm sorry, what? They should have just left the signs up, in your view, or some sort of warning. Yeah, anything. I mean, they've got a big mountain climber school there and big stores the size of this room. They sell mountain climbing equipment. Put a sign up in there. I'm not asking for them to do very much. And the cases say they don't have to do very much. Well, I guess I'm still having a problem. What would the signs say? Warning, rockfall. Sort of a meaningless sign in the context. Wouldn't they have to refer there was previously? Sure, they could put the dates on there. On November 18th, 185 tons of rock fell down here. On May 29th, 295 tons of rock fell down here. Doesn't that happen all the time in the park? No. Why would anybody respond to such a notice? Until November of 1998, there had been no recorded significant rockfall into the area behind Curry Village. At that one spot. Huh? At that spot. Along that whole? I take it there have been rockfalls other places in the valley. Oh, sure. It's continuous. A sign on each one? No, because you're talking, again, we're talking about where they're currently going on. Because, you know, sooner or later, Yosemite is going to be flat. Counsel, let me ask you another question, because you're going to run out of time if I don't. I gather that at least part of your claim goes to the question of maintenance, and particularly maintenance up on what I'll call the mesa on top. What I'm trying to understand is I'm not sure whether your claim is that maintenance standards were set improperly, that there were maintenance standards set, and those standards weren't followed, or both, or what? No, what we're saying is that on the point up there above both Happy Isle and Curry Village, the government undertook to build a rather major renovation, and it didn't do any of the pre-activity review for hazards, for geological problems, for any of the reviews that it's required by its own regulations to do prior to beginning that work. And then it did that work at one point in 1950, 1996. Let me back on that. That doesn't sound like a maintenance question. That sounds to me like a design question. It actually, well, it has to do with whether or not, it has to do with leaving a part of the design process out. Well, I'm talking about maintenance now, not design. They designed it in a particular way, and the way they designed it was to run wastewater off to a particular place. You don't think they should have done that, but that's how they designed it. You may not like the way they designed it. You may think they skipped a step and didn't design it properly. That's design. But your complaint in your case is talking about maintenance. What I'm asking you is, it's designed now. The effluent is going off where it's supposed to go per the design. What is the nature of your maintenance claim as a separate claim? There are two separate issues. The effluent has had to do with 1956. I'm sorry. What was going on after that was that they built a comfort station up there with a septic system that wouldn't work, and then they brought water in from another watershed and treated it. Water that otherwise would have run into another part of the park and treated it. And then when they didn't use it, instead of turning it off, they just let it run over the top of the tank and out onto the ground. Well, and they empty the tank regularly too, I guess once a year. Every year. All right. What's that got to do with a maintenance standard set that was not followed? There was not a maintenance standard set that was not followed. They just didn't do anything about this extra water that they were bringing in behind this rock face, which is a terribly hazardous thing to do. What extra water? Water they're bringing from another watershed up on top of Glacier Point. They're pumping water. That was part of the original point. They were bringing in water and they were using it to, I guess, flush the toilets. Except they don't use it to flush the toilets. That would take it over there. What's the difference if the people are all using the bathrooms and they need this water to flush out the bathrooms and the bathrooms are stopped so they put the water out some other way, what makes the water that's spilling over worse than the water that was designed to go through the toilets and then out there? If the toilets had worked, the water would go through the toilets and out would go down a different side of the watershed and not in behind this rock. Where it runs over the tank is up on another hill where the water comes down, runs across the repaving that they did in the parking lot, the regrading in the parking lot, and is directed, as we can tell inadvertently, into an area where it goes right in behind this rock face, which is why we're getting rock fall in the summertime. You don't get rock fall in the summertime. Okay. Do you want to save some time for rebuttal? Yes, I do. Please. All right. We'll hear from the United States. May it please the Court, I'm Isaac Litsky here on behalf of the United States. I just want to pick up right where you were just now, Judge Fernandez and Judge McEwen, speaking about the issue of the facilities at the top of Glacier Point. I think, Judge Fernandez, you asked about sort of maintenance or this Court has talked about a sort of garden variety sort of evidence in the record and the question whether this may be a case that could fall in that type of line. I think the record is crystal clear that this is not such a case. As you said, pretty much notwithstanding the way plaintiffs endeavor to characterize it throughout their brief, the Glacier Point facility allegations fundamentally come back to their contention that the facilities shouldn't have been there, shouldn't have been designed the way they were, shouldn't have been operated the way they were. I think this Court's decisions render plain that that's precisely the type of decision that is insulated from judicial review by the discretionary function exception, even if the decision were ultimately negligent. So plaintiffs may be right. It's not for us today to determine whether the design of that facility was negligent. But nonetheless, that design is insulated from judicial review. I could speak a little more directly if the Court were interested to the specific record citations and where exactly plaintiffs purport to locate support for their various allegations. And I submit that there's absolutely nothing in the record before the Court today to support any sort of garden variety or maintenance type of allegation. Barring an interest on the part of the Court in a review of those types of citations, I'd like to also just maybe take a step back and sort of address the larger issue. Judge McEwen, you were questioning my colleague a little earlier about the nature of warnings and the nature of signs. And I think it's critical to keep in mind sort of the very specific context in which this case arises, namely the national parks. As the briefs render plain, the National Park Service is responsible for millions of acres of parkland. It has a mission of preserving those lands, also of exposing those lands and their natural beauty to the public and exposing as much as possible of those lands in their natural state to the public. And then lastly, there is an interest, obviously, in maintaining public safety. As this Court has recognized many times, those three competing policies, court policies, fundamentally oppose each other. And there is just simply no way the National Park Service could carry out its mission without routinely, consistently balancing those policies against each other in order to determine how to or in order best to determine in its judgment how to expose our citizenry to the natural parklands. I think the Court's unbroken precedents, most notably Valdez, Childers, Blackburn, Soldano as well I think is a very strong case on the signage issue. Also cases like Kelly, General Dynamics, and GATX Airlog. May I ask you then about those cases? Sure. Because we have a situation here where there's a major rock slide, you know, literally weeks before these kids and many others are back out climbing. There's not a single warning that's posted to say rock slide area or recent rock slide or anything like that. One of the points that Mr. Turbush's family's lawyer made is that you had, in their view, kind of a low-level guy, goes out, looks around and says, okay, well, now we'll release the warning. We have a couple of cases that potentially collide with your citation of Childers and Soldano. For example, in Farber, we said it would be wrong to apply the discretionary function exception to a situation where a low-level government employee made a judgment not to post a warning sign. And then we also have other cases, for example, that says Sailor, which is we doubt any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability. And there's a couple of others along those lines. How do we reconcile those cases with the situation here? Sure. I think those are fantastic cases to point to precisely to define, you know, sort of why this case is different or how it clearly falls within the scope. So Faber, for example, the first case Your Honor mentioned, in that case, that involved the National Park Service had recognized that these falls posed a particular hazard and had codified a specific remediation plan with respect to the danger at those falls that had three specific direct mandates. And the court in Faber held, well, look, once the National Park Service said, we think this is a major hazard, we're going to develop, we're going to implement this three-step mandatory plan to remediate the hazard. At that point, if the employees fail to implement that remediation plan with respect to that particular hazard, that's not a bona fide exercise of discretion-weighing policy. That's just a failure to implement the plan. So that's what happened. So the takeaway from that case, if I were the director of the National Park Service, is see no evil, hear no evil, put nothing make no mandatory provisions for correcting safety, because otherwise I'm going to find myself in the Faber case and not some other case. In other words, there's no any time you take corrective action, you put yourself at risk, any time you leave yourself without that, discretionary function gets you off the hook. No, Your Honor. Respectfully, I don't think that that's fair. I don't think that's right. I think the takeaway from Faber is the National Park Service, and Faber recognizes, and Blackburn spoke about, made this distinction with respect to Faber, explicitly treated Faber. But I think the takeaway from Faber is the National Park Service has a monumental task, no pun intended, of managing these millions of acres of parkland, trying to develop facilities for their public enjoyment, trying to maintain aesthetic beauty, access for the disabled, efficient use of energy, et cetera, et cetera, et cetera. And in that monumental task, it has to be left to the National Park Service in the first instance to determine which hazards it deems warrant remediation or warning or closure. That decision has to be left to the Park Service in the first instance. That decision was not made by the Park Service here with respect to Glacier Point. Maybe it should have been. Fair enough. In Faber, it's a completely different case. In Faber, the National Park Service, again, had made the decision, this is a hazard, we are going to remediate. And it implemented a plan and had not done so. And Saylor, Your Honor, which is the other case Your Honor mentioned, was also a very different case. First off, that was sort of an older case. It predated Gaubert. So I think some of this Court's precedents have sort of questioned the vitality of that case. But a more direct difference, Saylor was a Bureau of, I believe it was a Bureau of Indian Administration case, BIA. It was not a National Park Service case. Unlike in this case, in Saylor the Court said, look, we don't have any evidence that there was some weighing of competing policies here with respect to failure to warn of some danger. That was more like the random rock in the supermarket that Judge Fernandez spoke to earlier. You can't say as a supermarket, well, we're going to advance a policy of aesthetic beauty by leaving rocks in the aisles. So that was Saylor, where here, again, you know, this Court's unbroken line of cases render plain that in the Park Service context, precisely whether and how to warn falls squarely within the aim of the discretionary function exception. I draw the Court's attention again to Childers, Valdez, Blackburn, Soldano as well, where the Court even there where it was a I want to stress something about Soldano. Soldano there, we had a National Park Service created hazard, namely the road, right? It was a hazard the National Park Service was aware of, right? And still the Court, I think very sensibly, concluded reviewing the policies, the very same policies that are before the Court today, that the decision whether and how to warn of that hazard fell within the discretionary function exception. So with all due respect. How does that then fit with another Park Service created hazard? I think the Summers case where you have the little campfire circle and hot coals and then a child could burn themselves. So that was a National Park Service hazard where we said you should have warned them. How do you reconcile that with the case you just mentioned, which was, I guess, Soldano? Well, to begin, Blackburn explicitly said that this Court's discussion in Summers of a duty to warn was dicta and was inconsistent with a long line of subsequent precedent. And that's in Blackburn. We think that's ultimately correct. I think there was. One person's dicta is another person's holding, as you know. It's true, Your Honor. I think that's true. And in all fairness, I think Summers was and remains maybe a closer case. I think, you know, here, at the end of the day, what we're talking about is the danger posed by rockfall in a 3,000-foot rock cliff in a natural park. You know, I think it's as tragic as the accident is, I think it's clear that were this the type of activity that could create liability for the National Park Service? Well, Summers is a strange case. I mean, no question about it, because one would think that it's pretty obvious one shouldn't step on hot coals, but be that as it may, if I recall Summers had said they knew that hot coals in the ring were a danger and didn't tell people you shouldn't step on hot coals, which sounds a little different from this case. I think that's definitely right, Your Honor. I certainly agree wholeheartedly that Summers is a bit of an odd case and is difficult to reconcile certainly with all the precedent subsequent to Summers. And again, at the risk of being repetitive, Blackburn explicitly says Summers kind of doesn't fit with everything else. I hesitate to sort of endorse wholeheartedly the distinction of they knew versus they didn't know, because I don't think that that is a dispositive difference. So in the case like Blackburn, for example, well, the National Park Service built Stoneman Bridge and ostensibly knew that diving off a bridge into shallow water poses a risk. In Valdez, for example, the National Park Service built Sunset Trail, which led folks to the falls that issue in that case and ostensibly knew that by providing people access to these falls you might create some accidents. So I don't think the line can be knowledge of the hazard somehow removes discretion. And that's, again, because in the larger context, the Park Service basically runs one ginormous hazard. I mean, there's zillions of hazards throughout our wilderness lands. Well, assuming that knowledge had some evidentiary value in determining the discretion point, is there any evidence in this record that the Park Service knew that its wastewater program and plant or treatment somehow contributed to rockfall? Well, I think the plaintiffs would point to an e-mail exchange between several geologists. I think one of them was the U.S. geologist, and I think this is in the record. I think roughly around pages 50 to 60, somewhere in there, I think there are some e-mails. And I think they would say, yes, you had that gentleman who stayed at Curry Village, was alarmed by the May 1999 rockfall and wrote all sorts of e-mails and said you folks really, really should look at this. I'd stress that at that point the glacier facilities had already been designed, built, and were being operated. And I think it's clear that the decision whether to investigate further, whether to remediate the alleged danger, things to that effect fall squarely within the discretionary function exception. I don't think knowledge of risk can be the line, with all due respect, Your Honor. I think, you know, so, for example, in Kelly, I don't think there's any argument that the government didn't know that flying these fire suppression missions over low, low national forests was an extremely dangerous activity and would greatly contribute to the likelihood of risk of the pilots. So the knowledge of the risk, I don't think, can be the line. That presumably would come up in liability. Were you to find that it wasn't a discretionary function then, correct? Oh, to be sure, and I appreciate the opportunity to clarify that. To be sure, I think, you know, if you look at our pleadings before the trial court, I think the discretionary function exception is sort of but the first in a line of defenses that we would assert below, you know, assumption of risk being the most notable other defense. But certainly, and Judge Trager, you were speaking to this a little earlier with respect to potential proximate causation issues. You know, certainly were the court to reverse on the discretionary function exception, which, again, we think would be, you know, a gross error. At that point, I guess the case would go back and there would, you know, obviously there would need to be further factual development and liability would need to be established. On the factual development point, I do also want to leave the court with what I think is an important point. There were three years of discovery or three years of available time for discovery between the filing of the complaint, which was also well after the administrative exhaustion period. But let's just say between the filing of the complaint and the actual motion to dismiss, we had well over three years. So I think the record before the court is pretty sparse, in particular on this sort of maintenance issue. Judge Fischer speaks about it. I think they pretty much point to one declaration, the Watts Declaration, at pages 50 to 52 in the record. For informational purposes, you have about five minutes left.  Thank you. I guess, I mean, you know, unless the court has anything further on those maintenance allegations or on anything else, I would just, you know, want to stress that the district court's decision here was careful, was thorough, and the district court really, you know, reviewed all the various policies at issue. And as the district court fleshed out and as we fleshed out in our brief, really, there just are no mandatory policies to be found anywhere. The park safety officer allegations that we spoke about a little earlier are, with respect, with all due respect to opposing counsel, are clearly wrong. There was no affirmative duty that a park safety officer participate in that investigation. Counsel, you mentioned maintenance again. Sure. Is there any evidence in this record about whether there were maintenance standards set for this step up on the top of the point, or were there standards set? Did somebody not follow the standards? Was water run this way or that way, et cetera? Oh, no, there's absolutely nothing in the record to suggest that there were standards of some form. I think that's clear. I suspect counsel would concede as much. There are sort of allegations made in their brief, sort of trying to shade this as more of a kind of garden variety maintenance. Someone failed to sort of tighten the bolt or the screw. And in particular, they speak, I think, I'll draw the court's attention to their statement of facts. They speak to overflowing of water or sort of the unintentional spilling of water and things to that effect. Again, pointing to the part of the record they actually cite, pages 50 to 52 in the record. There's no support for those allegations. With those paragraphs 34, 36, and 39 of the Watts Declaration render plain that this facility was designed a certain way. There were water tanks. Those water tanks were intentionally drained, one at the end of every season, one because the decision was made to close facilities. And, again, whether negligent or not, whether properly designed or not, or whatever, that's not the question for the court. The decision to locate those facilities up there and run them in the manner they were run is a purely discretionary decision, implicating all sorts of NPS policies. Again, public comfort, aesthetically pleasing, energy efficient, safe, access to the disabled, and on and on and on. So as tragic as the events are or were that led to the events before the court today, I think it's clear that they can't pose a method for the courts to ex post facto sort of mandate the administration of the National Park Service in a way which, frankly, would kind of force them to sort of cease to exist as we enjoy them today. So we would respectfully urge the court to affirm the dismissal of the district court below, unless the panel has anything further.  You have a little time left for rebuttal. Thank you, Your Honor. Several things. First, there was a case I cited and documents I submitted to the court today. I simply – counsel didn't have it. I didn't have it until this weekend because of this illness. I didn't try and argue it, but I would just ask that the court look at it in considering its opinion. The clerk has copies of the letter. You just submitted that this morning? Yeah. All right. I found it over the weekend. I was two weeks late in getting started with this because of the problem I had. Secondly, so far as notice to the government, the running water in behind these rocks is a hazardous problem. It's a concern. They got that kind of notice after the rock fall in Happy Isles in 1996 when some geologists – graduate students started looking at all this to try and figure it out. Counsel relies heavily on three cases, Valdez, Childers, and Blackburn. I'd like to comment on them each very briefly. In Valdez, the Park Service trail did not take this fellow to the place where he fell. It took him to the bottom of the waterfall. He had to climb up an undeveloped waterfall to fall off of it. I don't think that that is a hazard the Park Service can reasonably anticipate because nobody had ever done it before and the trail was perfectly safe where it was. It didn't go to the top of the waterfall as opposed to, as you'll notice in the case that I cited, there was a trail that went to the top of the hazard and was treated quite differently than Valdez. In the Childers case, which is a case that happened in Yellowstone, what the court there held is that the discretionary exception allows the Park Service to determine which hazards are hazardous and don't need to – are obvious, rather, and don't need to be warned about and which don't, and specifically says on page 976 that the discretionary exception would not apply if the NPS recorded a requirement to give adequate warnings. Failure to warn is not discretionary. Methods of conveying warnings is discretionary, which is, again, the point in Blackburn where the guy was injured diving off of a bridge. The lawsuit was not, was he warned about the hazard? He was. There were six signs up there. They'd been there for 10 years. His lawsuit was he didn't think the warnings were adequate, but the warning said, do not dive off the bridge, danger. I don't think any of those cases really support the government's position in this regard. Thank you. Thank you. Thank both counsel for your argument. Yes? Can I just have 30 seconds to address the precedent that was submitted? No. We will – we haven't had an opportunity to review that. We'll review it, and if we want supplemental briefing or letters, then we'll advise both counsel. I thank you both for your arguments this morning. The case of Turbush v. United States is submitted.
judges: Fernandez, McKeown, Trager